WETHERELL, J.
Appellant, Walter E. Headley, Jr., Miami Lodge No. 20, Fraternal Order of Police, Inc. (hereafter “the Union”), seeks review of a final order of the Public Em *888 ployees Relations Commission (PERC) dismissing the Union’s unfair labor practice (ULP) charge against the City of Miami (City). The Union argues that (1) PERC erred in determining that the City was facing a “financial urgency” that required modification of the parties’ collective bargaining agreement (CBA) pursuant to section 447.4095, Florida Statutes (2010), and (2) PERC erred in construing section 447.4095 to allow the City to implement changes to the CBA prior to completion of the impasse resolution process set forth in section 447.403. For the reasons that follow, we conclude that PERC properly interpreted and applied section-447.4095. Accordingly, we affirm the final order.

Factual and Procedural Background

The Union is a certified bargaining agent representing officers employed by the City’s police department. The existing CBA between the City and the Union covered the period of October 1, 2007, through September 30, 2010. The parties began negotiations for a successor agreement in the spring of 2010 and, from the outset, the Union took the position that it would not agree to any modifications to the CBA on wages or pension benefits.
On July 28, 2010, while the parties were engaged in negotiations for a successor agreement, the City declared a “financial urgency” and invoked the process set forth in section 447.4095. The City informed the Union that it intended to implement changes to wages, pension benefits, and other economic terms of employment and that it was willing to meet with the Union and negotiate the impact of these measures. The Union did not request bargaining over the impact of the City’s decision to declare a financial urgency, but the parties continued to meet and bargain for a successor agreement. During these negotiations, the Union maintained its position that it would not agree to any modifications concerning wages and pension benefits.
On August 16, 2010, the City notified PERC that the parties had engaged in negotiations concerning the financial urgency and that a dispute remained. PERC provided the parties a list of special magistrates for the impasse resolution process, and although the parties agreed upon the selection of a special magistrate, they did not pursue the impasse resolution process with respect to the declaration of financial urgency.
The parties continued to meet and bargain for a successor agreement and, during these negotiations, the City provided the Union with the specific changes it intended to make to address the financial urgency facing the City. The Union did not provide the City a formal counter-proposal. Thereafter, on August 31, 2010, the City’s legislative body voted to unilaterally change the terms of the CBA in order to address the financial urgency.
The changes adopted by the City imposed a tiered reduction of wages, elimination of education pay supplements, conversion of supplemental pay, a freeze in step and longevity pay, modification of the normal retirement date, modification of the pension benefit formula, a cap on the average final compensation for pension benefit calculations, alteration of the normal retirement form, and modification of average final compensation. Some of the changes went into effect on September 30, 2010, while others went into effect on October 1, 2010, which was the first day of the City’s 2010/2011 fiscal year.
On September 21, 2010, the Union filed a ULP charge with PERC. The Union alleged that the City committed a ULP by improperly invoking section 447.4095 for the purpose of altering the terms and conditions of employment after expiration of the CBA. The Union further alleged that *889 the City committed a ULP by unilaterally altering financial terms and conditions of employment before completing the impasse resolution process provided for in section 447.403.
The case proceeded to a hearing before a PERC hearing officer at which the City presented extensive evidence of the dire financial situation it was facing. The evidence established that the City’s budget was approximately $500 million and that it faced a deficit of approximately $140 million for the 2010/2011 fiscal year; that the City had already implemented hiring freezes, completed all previously contemplated layoffs, ceased procurement, and instituted elimination of jobs as employees left; that labor costs comprised 80% of the City’s expenses; that, if additional action was not taken to reduce expenditures, the City’s labor costs would exceed its available funds, which would leave the City unable to pay for utilities, gas, and other necessities and render it unable to provide essential services to its residents; and that the City’s unemployment rate was 13.5% and property values were in decline, with 49% of homes in the City having a negative equity.
The Union acknowledged that the City faced a difficult financial situation, but it took the position that the City’s financial problems did not require modification of the CBA. The Union’s witnesses suggested that the City could overcome its budgetary shortfall without modifying the CBA by raising the millage tax rate, installing red light cameras, imposing nonunion employee layoffs and furloughs, freezing the current cost of living adjustment, and changing the pension funding methodology.
The City responded with evidence showing that the Union’s suggestions would not adequately address the shortfall because they either failed to generate enough revenue to offset the deficit or because they would increase the City’s long term financial obligations. For example, with respect to increasing the millage rate, the City Manager testified that, even if the City Commission raised the rate to the maximum allowed by law, the additional funds would make up less than 40% of the projected deficit and that the increased rate would negatively impact the City’s already-reduced credit rating and its ability to borrow funds.
The PERC hearing officer issued an order recommending dismissal of the Union’s ULP charge. The hearing officer found that the City properly invoked the provisions of section 447.4095 because the evidence established that the City was facing a financial situation that continued to deteriorate despite the actions taken by the City short of modifying the CBA. The hearing officer also rejected the Union’s argument that the City was required to proceed through the impasse resolution process before implementing the changes in the CBA because the financial urgency statute contemplates “impact bargaining” pursuant to which the “employer may implement the action and then subsequently complete the impasse resolution process.”
In the final order, PERC adopted and expanded on the definition of financial urgency used by the hearing officer. PERC explained that “[a] financial urgency is a financial condition requiring immediate attention and demanding prompt and decisive action which requires the modification of an agreement; however it is not necessarily a financial emergency or bankruptcy.” PERC further explained that a determination of financial urgency requires “a close examination of the employer’s complete financial picture on a case-by-case basis” and an evaluation of whether the employer was “acting in good faith when it declared financial emergency.” On the issue of good faith, PERC explained that the focus is whether a reason *890 able person could reach the conclusion that “funding was not available to meet the employer’s financial obligations to its employees.”
The final order also adopted the hearing officer’s conclusion that section 447.4095 did not require the City to proceed through the impasse resolution process before implementing the changes to the CBA. Like the hearing officer, PERC interpreted the statute to require “impact bargaining” pursuant to which the employer need only provide notice and a reasonable opportunity to bargain before implementing the changes. PERC noted that if the statute was interpreted to require the City to proceed through the impasse resolution process before implementing changes to the CBA, the purpose of the statute would be frustrated because of the delays inherent in that process.
Commissioner Delgado filed a dissent. He disagreed with the majority’s conclusion that the City properly invoked section 447.4095 because, in his view, the statute required the local government to prove that its financial condition required modification of the agreement, which pursuant to Chiles v. United Faculty of Florida, 615 So.2d 671, 678 (Fla.1993), required the local government to demonstrate that there were “no other reasonable alternative means of preserving its contract with public workers, either in whole or in part.” He also disagreed with the majority’s conclusion that the local government could implement the changes to the CBA before proceeding through the impasse resolution process.
The Union timely appealed the final order to this Court.

Standard of Review

Our review of the final order is governed by the standards in section 120.68, to wit, questions of statutory interpretation and other legal conclusions are reviewed de novo and factual findings are reviewed for competent substantial evidence. See § 120.68(7)(b), (d), Fla. Stat.; Sch. Dist. of Polk Cnty. v. Polk Educ. Ass’n, 100 So.3d 11, 14-15 (Fla. 2d DCA 2011). However, because of PERC’s special expertise in public sector labor law matters, we will defer to PERC’s interpretation of chapter 447 unless the interpretation is clearly erroneous or contrary to the plain and ordinary meaning of the statute. See United Faculty of Fla. v. Pub. Emps. Relations Comm’n, 898 So.2d 96, 100 (Fla. 1st DCA 2005) (“On judicial review of PERC orders, the view of the PERC majority is, we have often said, presumptively the product of special expertise to which courts should defer.”); Laborers’ Int’l Union of N. Am. v. Greater Orlando Aviation Auth., 869 So.2d 608, 610-11 (Fla. 5th DCA 2004) (“PERC’s decisions are entitled to great deference by the courts due to its enlightened experience in such matters. PERC has developed special expertise in addressing labor issues and is uniquely qualified to interpret and apply the policies enunciated in Chapter 447. Thus, it is not our province to displace PERC’s choice between two conflicting views simply because we would have been justified in deciding the issue differently were it before us in the first instance.”) (citations and internal brackets and quotations omitted).

Analysis

The right to collectively bargain is a fundamental right enshrined in the declaration of rights article of the Florida Constitution. See Art. I, § 6, Fla. Const. (“The right of employees, by and through a labor organization, to bargain collectively shall not be denied or abridged.”). Accordingly, as a general rule, an agreement concerning wages, hours, or terms and conditions of employment reached through the collective bargaining process cannot be unilaterally modified during the term of the agreement absent a compelling state *891 interest. See Chiles, 615 So.2d at 673; Manatee Educ. Assoc. v. Sch. Bd. of Manatee Cnty., 62 So.3d 1176, 1178 (Fla. 1st DCA 2011).
Because section 447.4095 impairs collective bargaining rights, the statute must be narrowly construed. See Dep’t of Admin. v. Pub. Empls. Relations Comm’n, 443 So.2d 258, 259 (Fla. 1st DCA 1983) (explaining that the statute defining “managerial employees” must be narrowly construed because of the “constitutional overtones of collective bargaining and the loss of the right to collectively bargain when managerial status is conferred”). However, the statute must not be so narrowly construed that its purpose is undermined or frustrated. Cf. Duan v. State, 970 So.2d 903, 907 (Fla. 1st DCA 2007) (explaining that even when the rule of strict construction applies, the statute should not be construed so strictly “as to emasculate the statute and defeat the obvious intention of the legislature” because “strict construction is subordinate to the rule that the intention of the lawmakers must be given effect”) (quoting State ex rel. Wash. v. Rivkind, 350 So.2d 575, 577 (Fla. 3d DCA 1977)).
With these general principles in mind, we now turn to the specific issues raised by the Union on appeal.

1

First, the Union contends that PERC misconstrued section 447.4095 and erred in determining that the City was facing a financial urgency requiring modification of the CBA. We disagree.
Section 447.4095 provides:
Financial urgency. — In the event of a financial urgency requiring modification of an agreement, the chief executive officer or his or her representative and the bargaining agent or its representative shall meet as soon as possible to negotiate the impact of the financial urgency. If after a reasonable period of negotiation which shall not exceed 14 days, a dispute exists between the public employer and the bargaining agent, an impasse shall be deemed to have occurred, and one of the parties shall so declare in writing to the other party and to the commission. The parties shall then proceed pursuant to the provisions of s. 447.403. An unfair labor practice charge shall not be filed during the 14 days during which negotiations are occurring pursuant to this section.
Section 447.4095 does not define “financial urgency,” nor is the term defined elsewhere in Chapter 447. The legislative history of the statute provides no insight as to the intended meaning of “financial urgency;” the staff analysis notes only that the term is undefined in the bill or in chapter 447 and that its interpretation is left to practice. See Fla. S. Comm. on Govtl. Ops., CS for SB 888 (1995) Staff Analysis (March 27, 1995) (on file with comm.).
We considered the statute in Manatee Education Association, but in that case, we declined to address what constitutes a “financial urgency” under the statute. Instead, we deferred the issue to PERC in the first instance due to its “expertise is public sector labor regulation.” 62 So.3d at 1183 (quoting Doyle v. Dep’t of Bus. Reg., 794 So.2d 686, 690 (Fla. 1st DCA 2001)). Now that PERC has interpreted and applied the statute, the issue we declined to address in Manatee Education Association is ripe for our consideration.
The Legislature’s use of the word “urgency” implies a financial condition requiring immediate action.[1] The fact that *892 there are other statutes that apply when a local government is facing a financial emergency[2] or bankruptcy[3] implies that a financial urgency is something less dire than those conditions. Thus, consistent with the definition adopted by PERC, we conclude that a financial urgency is a dire financial condition requiring immediate attention and demanding prompt and decisive action, but not necessarily a financial emergency or bankruptcy.
The existence of such a financial condition is a compelling state interest that can justify a unilateral modification of a CBA,[4] but based on the plain language of the statute, section 447.4095 may only be invoked if the financial condition requires modification of the agreement. Thus, if the financial condition can be adequately addressed by other reasonable means, then a modification of the agreement is not “required.” If, however, the other reasonable alternatives available to the local government are not adequate to address the financial condition facing the local government, then section 447.4095 permits the local government to unilaterally modify the CBA.
This is similar to the test applied in Chiles. In that case, in response to “continuing revenue shortfalls,” the Legislature postponed and then eliminated a pay raise that had been ratified through the collective bargaining process. See Chiles, 615 So.2d at 672. The trial court determined that the Legislature’s actions violated the right to collectively bargain and constituted an impermissible impairment of contract, and the Florida Supreme Court affirmed. Id. at 673.
The Court recognized that the Legislature “must be given some leeway to deal with bona fide emergencies” and held that the Legislature has the authority to reduce previously approved appropriations to pay public workers’ salaries. Id. But the Court explained that in order for the Legislature to validly exercise this authority, it must demonstrate (1) “a compelling state interest,” and (2) that there are “no other reasonable alternative means of preserving its contract with public workers, either in whole or in part.” Id.; see also id. at 674 (Grimes, J., concurring) (expressing the view that “the legislature was required first to make other reasonable reductions in appropriations or seek other reasonable sources of revenue” before eliminating a pay raise agreed upon in the collective bargaining process).
The Court emphasized that “[t]he mere fact that it is politically more expedient to eliminate all or part of the contracted funds is not in itself a compelling reason.” Id. at 673. The same is true under section 447.4095 because the fact that it may be politically more expedient for the local government to modify the CBA than to implement other cost-saving or revenue-raising measures is insufficient, standing alone,[5] to demonstrate that the modification of the CBA was required.
*893 We recognize that in discussing the second prong of the test set forth above, the Court stated that “the legislature must demonstrate that the funds are available from no other possible reasonable source.” Id. at 673. However, we are not persuaded that this restrictive standard is constitutionally mandated or that it should be extended to section 447.4095. Accordingly, we conclude that in a proceeding under section 447.4095, the local government is not required to demonstrate that funds are not available from any other possible source to preserve the agreement; instead, the local government must only show that other potential cost-saving measures and alternative funding sources are unreasonable or inadequate to address the dire financial condition facing the local government.
The local government’s determination that a financial urgency exists is not conclusive and is subject to review at PERC. Manatee Educ. Ass’n, 62 So.3d at 1183; see also City of Miami v. Fraternal Order of Police, Miami Lodge 20, 98 So.3d 1236, 1237 (Fla. 3d DCA 2012) (reversing temporary injunction prohibiting city manager from declaring financial urgency and noting that section 447.4095 “provides an expedited collective bargaining process when invoked, with an impasse resulting in prompt (and preemptive) submission of the dispute to [PERC].”) (footnote omitted). Such review typically occurs in a ULP proceeding filed after the local government unilaterally modifies the agreement to address the financial urgency. See Manatee Educ. Ass’n, 62 So.3d at 1178 (“The public employer does not have to obtain a ruling that a genuine ‘financial urgency1 exists before it proceeds under section 447.4095”). The availability of this review in a neutral forum, albeit after-the-fact, helps to safeguard the employees’ collective bargaining rights. See City of Miami, 98 So.3d at 1238-39.
In such a proceeding, the ultimate factual issues to be determined by the hearing officer are (1) whether the local government was facing a “financial urgency,” as defined above, and, if so, (2) whether the financial situation facing the local government required the modifications imposed by the local government.[6] In making these determinations, the hearing officer will need to (a) undertake a close examination of the local government’s complete financial picture, including the circumstances that led to the declaration of the financial urgency; (b) consider whether, absent the modifications, the local government would have been able to continue to meet its financial obligations to its employees as well as its other obligations; (c) consider the other actions taken by the local government to address its financial condition before proceeding under section 447.4095; and (d) evaluate whether there were other reasonable alternatives considered by the local government or proposed by the party challenging the modifications that would have adequately addressed the financial situation facing the local government.
Here, the recommended and final orders reflect that the hearing officer and PERC considered all of these factors in determining that the City was facing a dire financial situation that required modification of the CBA, and there is compe *894 tent substantial evidence in the record to support the factual findings made by the hearing officer and adopted by PERC. Accordingly, we affirm PERC’s determination that the City properly invoked the procedures in section 447.4095 and, thus, did not commit a ULP when it unilaterally modified the CBA.

2

Second, the Union contends that PERC erred in construing section 447.4095 to allow the City to unilaterally modify the CBA without first proceeding through the impasse resolution process set forth in section 447.403. We disagree.
Section 447.4095 provides for an expedited period of negotiation, not to exceed 14 days, upon declaration of a financial urgency by a local government and requires the parties to meet as soon as possible after the declaration to “negotiate the impact” of the financial urgency. The statute further provides that, if a dispute remains between the parties after the expiration of the expedited negotiation period, an impasse shall be deemed to have occurred and “[t]he parties shall then proceed pursuant to the provisions of s. 447.403.” § 447.4095, Fla. Stat.
The impasse resolution process in section 447.403 begins with the appointment of a special magistrate who is charged with conducting a hearing and making a recommendation to the local government’s legislative body as to the resolution of any disputed issues. See § 447.403(3), Fla. Stat. The statute does not establish a deadline for the hearing, but it does provide for at least 45 days of post-hearing procedures. See § 447.403(3)-(4), Fla. Stat. (providing 15 days for the special magistrate to submit his or her recommended decision to the parties, 20 days for the parties to reject the special magistrate’s recommendations, and then 10 days for the local government’s chief executive officer to submit his or her recommendations to the legislative body). The legislative body is not required to accept the special magistrate’s recommendations and, thus, the end-result of the impasse resolution process may be the local government unilaterally imposing changes to the agreement. See § 447.403(4), Fla. Stat.
In interpreting section 447.4095 to allow for modification of a CBA without proceeding through the impasse resolution process, PERC gave great weight to the Legislature’s use of the phrase “negotiate the impact,” which PERC construed as a reference to “impact bargaining.” The Union, in turn, focuses on the language in the statute directing the parties to “then proceed” to the impasse resolution process after the 14-day bargaining period.
The Union contends that by requiring the parties to immediately proceed through the impasse resolution process, section 447.4095 contemplates that no changes to the agreement will be made until the end of that process. The City responds that requiring the local government to proceed through the impasse resolution process would frustrate the intent of the statute because it would delay implementation of the modifications necessary to address the financial urgency.
Faced with these equally reasonable interpretations of the plain language of section 447.4095, we turn to the rules of statutory construction to discern the meaning of the statute. Cf. Atwater v. Kortum, 95 So.3d 85, 90 (Fla.2012) (“[W]hen the language of the statute is clear and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning”) (internal citations omitted). Most pertinent here is the rule of construction that when the words used in the statute *895 are technical in nature and have a fixed legal meaning, it is presumed that the Legislature intended that the words be given their technical meaning. See Crews v. Fla. Pub. Emp’rs Council 79 AFSCME, 113 So.3d 1063, 2013 WL 2421093, at *4 (Fla. 1st DCA June 5, 2013) (“In an effort to ascertain and give effect to the intention of the Legislature as expressed in the statute, courts should give words in a statute their ordinary and every day meaning unless the context reveals that a technical meaning applies.”) (internal quotation and citation omitted); see also 48A Fla. Jur. Statutes § 139 (“[T]echnieal words and phrases that have acquired a peculiar and appropriate meaning in law cannot be presumed to have been used by the legislature in a loose, popular sense. To the contrary, they are presumed to have been used according to their legal meaning”); Garcia v. Vanguard Car Rental USA, Inc., 540 F.3d 1242, 1246-47 (11th Cir.2008) (“When Congress employs a term of art, it presumptively adopts the meaning and ‘cluster of ideas’ that the term has accumulated over time.”).
Here, the parties agree that “impact bargaining” is a term of art in public sector labor law that describes the type of bargaining applicable to managerial decisions that impact terms and conditions of employment within the bargaining unit. See Sch. Dist. of Indian River Cnty. v. Fla. Pub. Emps. Relations Comm’n, 64 So.3d 723, 729 (Fla. 4th DCA 2011); Jacksonville Supervisors Ass’n v. City of Jacksonville, 25 FPER ¶ 30289 (1999), aff'd in part and rev’d in part, 791 So.2d 508 (Fla. 1st DCA 2001). Impact bargaining generally requires only notice and an opportunity to negotiate before the proposed changes are implemented. Id. Thus, unlike typical bargaining, impact bargaining allows the employer to implement certain types of decisions without going through the full collective bargaining process.
We agree with PERC that it is reasonable to infer that the Legislature intended the phrase “negotiate the impact” in section 447.4095 to be a reference to “impact bargaining.” The declaration of the financial urgency and the 14-day negotiating period in the statute is the notice and reasonable opportunity to negotiate that is required in the context of “impact bargaining.” Then, if a dispute remains at the end of the negotiation period, the impasse resolution process is available for the parties to resolve the dispute but, consistent with the principles of impact bargaining, the local government may immediately impose the modifications to the agreement needed to address the financial urgency. Cf. Commc’ns Workers of Am., 888 So.2d at 98 (quoting a 2001 letter in which PERC’s general counsel opined that “in the event of a financial urgency requiring modification of a collective bargaining agreement, [section 447.4095] allows an employer to unilaterally change wages, hours, and terms and conditions of employment after bargaining the impact of the change for a ‘reasonable period’ not to exceed 14 days”).
This interpretation is not clearly erroneous and is entitled to deference. It is also consistent with the purpose of the statute in that it allows for a 14-day period of impact bargaining but also allows for the local government to take immediate action toward correcting a financial urgency at the conclusion of the bargaining period rather than requiring such action to be postponed until the completion of the impasse resolution process. This is significant because, as noted above, the impasse resolution process includes 45 days of process after the special magistrate hearing is completed. Indeed, as PERC noted in the final order, requiring a public employer to wait to take action until after the completion of the process hinders the employer’s ability to take immediate action, which, by *896 the very definition of financial urgency, is required.
We recognize that allowing the local government to immediately impose unilateral changes to the agreement upon the conclusion of the 14-day impact bargaining period in section 447.4095 will change the “status quo” between the parties, but if it is later determined in a ULP proceeding that no financial urgency existed or that the changes were not required to address the financial urgency, PERC has broad authority to remedy the ULP. See § 447.503(6), Fla. Stat. This, coupled with the narrow circumstances in which the statute applies, adequately safeguards the right of public employees to collectively bargain.
In sum, we agree with PERC that a local government acting pursuant to section 447.4095 is not required to proceed through the impact resolution process in section 447.403 before modifying the CBA. Accordingly, we affirm PERC’s determination that the City did not commit a ULP when it unilaterally modified the CBA without first proceeding through the impact resolution process.

Conclusion

For the reasons stated above, we conclude that PERC did not err in interpreting or applying section 447.4095. Accordingly, we affirm the final order dismissing the Union’s ULP charge.
AFFIRMED.
ROWE and MAKAR, JJ., concur.

. See American Heritage College Dictionary (3d ed. 1993) at 1485 (defining "urgency” as "[t]he quality or condition of being urgent; *892 pressing importance,” and defining "urgent” as "[cjornpelling immediate action or attention; pressing”).

. See § 218.503, Fla. Stat.

. See § 218.01, Fla. Stat.

. Cf. Commc'ns Workers of Am. v. Indian River Cnty. Sch. Bd., 888 So.2d 96, 101 (Fla. 4th DCA 2004) ("Needless to say, the future solvency of the employee’s health insurance plan, assuming such a financial urgency exists, is surely a compelling interest.”).

. This does not mean that political considerations must be ignored altogether in evaluating the "reasonableness” of other potential cost-saving measures or sources of revenue; however, without more, political considerations are not enough to justify a unilateral modification of a CBA.

. Even though these issues arise in a ULP proceeding in which the charging party has the ultimate burden of proof, the local government has the burden to establish that its actions were justified under section 447.4095 once the charging party presents a prima facie case that the local government committed a ULP by unilaterally modifying the CBA. The standard of proof is a preponderance of the evidence. See §§ 120.57(l)(j), 447.503, Fla. Stat.